In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 07-1103

GZIME ZEQIRI and ALBULEN ZEQIRI,

*Petitioners*,

*v.*

MICHAEL B. MUKASEY, Attorney General
of the United States,

*Respondent*.

———————

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A79-417-107/108

———————

ARGUED NOVEMBER 29, 2007—DECIDED JUNE 3, 2008

———————

Before CUDAHY, POSNER, and EVANS, *Circuit Judges*.

CUDAHY, *Circuit Judge*. Gzime Zeqiri and her eleven-year-old son, Albulen, arrived at Miami International Airport on September 8, 2001 carrying false Slovenian passports. They were, however, actually citizens of Macedonia. They had recently fled the ethnic conflict that consumed much of that country during the spring and summer of 2001. They were admitted into the United States under the Visa Waiver Program but failed to file their asylum applications within a year of their arrival, as required by the Immigration and Naturaliza-

tion Act (INA) and the regulations promulgated under it. The Zeqiris attempted to persuade an immigration judge that "extraordinary circumstances" excused their late filing but the judge dismissed their applications as untimely and rejected their claims for withholding of removal and relief under the Convention Against Torture. The Board of Immigration Appeals (Board) dismissed their appeal in a brief order that affirmed and adopted the findings of the immigration judge.

Zeqiri now appeals from the Board's decision.[1] We dismiss much of her petition for review because she raises issues regarding the timeliness of her asylum application that she never raised before the Board and over which, in any event, we lack jurisdiction. Because she failed to exhaust her administrative remedies with respect to these issues, they are deemed forfeited. We deny the rest of her petition because we believe that the Board's decisions were supported by sufficient evidence.

## I.

Gzime Zeqiri and her son are natives of Macedonia. Zeqiri was born in the town of Zhutova, which lies in the northwestern corner of Macedonia, close to the border with Albania and Kosovo. She lived at her father's house and she worked on the family farm. The Zeqiris are ethnic Albanians and thus part of an ethnic minority in Macedonia; much of Macedonia's ethnic Albanian population lives in northwestern Macedonia.

---

[1] Albulen Zeqiri premised his right to relief on his mother's application. *See* 8 U.S.C. § 1158(b)(3)(A). For simplicity's sake, we refer only to Gzime Zeqiri's application.

In early 2001, a violent conflict broke out between an ethnic Albanian insurgent group known as the National Liberation Army (NLA) and Macedonian military and police forces. The conflict began in February 2001 when the NLA launched an insurgency near the Kosovo border; it spread through northern and western Macedonia, often proceeding village by village. The conflict peaked during late spring and early summer before a peace agreement was reached in the fall. Allegations of serious human rights abuses have been leveled on both sides of the conflict. Human rights groups report that villages under NLA control were shelled indiscriminately by the Macedonian military. The government denies those charges and accuses the NLA of using civilian populations as human shields. In either case, it is clear that innocent civilians were caught in the cross-fire. Over 170,000 people were displaced from their homes by the fighting. Many never returned.

Zhutova, where Zeqiri lived, is a small town; the nearest city of any size is Tetova. Zeqiri's sister was a faculty member at the University of Tetova (the country's most prominent Albanian-language university) and Zeqiri would often visit her there. In February 2001, Zeqiri was traveling on a train from Zhutova to Tetova when a grenade exploded in another car; although the explosion was powerful, it did not derail the train and Zeqiri did not learn about it until after she disembarked. She claims that the bomb was placed by Macedonian security forces to kill ethnic Albanians.

Apparently, the University of Tetova was perceived as overly sympathetic to the ethnic Albanian cause. In March 2001, Macedonian security forces stormed a university building and began to forceably evict faculty

members. Zeqiri and her sister were inside the building at the time. They were expelled from the building and Zeqiri found herself swept up in a large student protest that had gathered around the university. Macedonian security forces were trying to disperse the crowd and began rounding up students. Zeqiri tried to explain that she was not a student but was arrested anyway, along with her sister. Zeqiri was handcuffed and taken to a local jail, where she was held for two days. Zeqiri testified that she was intimidated and "psychologically abused" while in custody. Before she was released, the guards threatened to "strangle" her if she was caught helping the students in the future. Zeqiri's sister was roughed up a bit by security forces, although "not too bad[ly]," but Zeqiri was not beaten or physically abused while in jail. There were, however, reports that students had died while in police custody.

Meanwhile, Zhutova had become engulfed in the conflict between the NLA and Macedonian security forces. Zeqiri's village, like many others, was often surrounded by Macedonian forces. On July 12, 2001, Zeqiri and her family, fearing for their safety, fled their home and crossed the border into Albania, along with many of their neighbors. She later learned that her house had been burned to the ground. Her father gave her money to purchase false Slovenian passports, and Zeqiri bought plane tickets for the United States.

The Zeqiris arrived at Miami International Airport on September 8, 2001. They were immediately questioned by Immigration and Naturalization Service (INS) officials. Although they were carrying fake passports, they expressed fear at the prospect of returning to Macedonia, and so INS officials allowed Zeqiri entry under the Visa

Waiver Program. *See* 8 C.F.R. § 217.4(a)(1). An immigration officer also conducted a short interview of Zeqiri, which was conducted in her native tongue. Zeqiri was asked if she was a member of any political organizations. She said that she was "Islamic" but denied being a member of any political group. She was also asked whether she had ever been arrested in the past. She answered "no." A transcript of the interview was taken; Zeqiri checked it for accuracy and signed the bottom of the page. INS officials then placed the Zeqiris into "asylum only proceedings" and served her with a Notice of Referral to Immigration Judge (Form I-863), which specifically noted her request for asylum. Zeqiri was reminded that she had to apply for asylum within one year. *See* 8 U.S.C. § 1158(a)(2)(B). Zeqiri and her son were then released.

On December 10, 2001, Zeqiri was notified that she had a master calender hearing before an immigration judge on March 22, 2002. Zeqiri appeared in court on that date, but her hearing was continued until September 20, 2002, at which time the immigration judge told her that she had fifteen days to file an application. (The immigration judge apparently did not notice that the application was already late.) On October 3, 2002, the Zeqiris filed their applications for asylum.

On August 1, 2005, the immigration judge denied the petitioners' applications for relief. The judge found that Zeqiri's application for asylum was untimely because Zeqiri had arrived in the United States on September 8, 2001 but did not file an asylum application until October 3, 2002. Zeqiri argued that "extraordinary circumstances" justified her delay in filing. She claimed that she could not have filed on time because she did not speak English, she was unfamiliar with the legal system,

and she had no family in the United States. She also claimed that the "shock and trauma" of her recent experiences in Macedonia rendered her incapable of meeting the deadline. The immigration judge rejected these arguments. The judge noted that Zeqiri had advantages that other applicants often do not have: She had the aid of an interpreter at the airport, she had a friend who lived in the United States and she was specifically warned about the one-year deadline. The immigration judge also denied her other requests for withholding of removal; he did not credit the story regarding her arrest at the University of Tetova because it contradicted the answers she gave to INS officials at the Miami airport. On December 15, 2006, the Board dismissed Zeqiri's appeal in a brief order.

## II.

We first address the dismissal of Zeqiri's asylum application as untimely. To qualify for a discretionary grant of asylum, an applicant must demonstrate "by clear and convincing evidence" that the application was filed within one year of his or her entry into the United States. *See* 8 U.S.C. § 1158(a)(2)(B); 8 C.F.R. § 208.4(a). It is undisputed that Zeqiri's application was not filed within one year of her arrival in the United States. Late applications may be accepted, however, if the applicant can show "either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application within the period." *See* 8 U.S.C. § 1158(a)(2)(D). Such extenuating circumstances must be proved "to the satisfaction of the Attorney General." 8 U.S.C. § 1158(a)(2)(D).

Under the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231, 310-11 (2005), our jurisdiction to review the timeliness of asylum applications is limited to the review of "constitutional claims or questions of law." 8 U.S.C. § 1252(a)(2)(D). We review neither the factual findings nor the discretionary determinations made by the immigration judge or by the Board. *See Vasile v. Gonzales*, 417 F.3d 766, 768 (7th Cir. 2005). Put simply, "questions of law" are "situations in which a case comes out one way if the Constitution or statute means one thing, and the other way if it means something different." *Viracacha v. Mukasey*, 518 F.3d 511, 515 (7th Cir. 2008).

Zeqiri is no doubt conscious of the restrictions placed on our review by § 1252(d)(1), for she has abandoned the argument she made before the immigration judge and the Board that "extraordinary circumstances" prevented her from filing on time. This should come as no surprise, because a determination whether "extraordinary circumstances" or "changed circumstances" exist typically involves factual determinations that we do not review. *See Kaharudin v. Gonzales*, 500 F.3d 619, 623 (7th Cir. 2007); *Vasile*, 417 F.3d at 768-69. Indeed, we have even suggested that such determinations may be committed to agency discretion by law. *See Vasile*, 417 F.3d at 768-69. Thus, any argument along those lines would have been futile.

Instead, Zeqiri presses an entirely new set of arguments, all of which are carefully framed as questions of law. She argues, for example, that the one-year filing deadline for asylum applications does not apply in proceedings under 8 U.S.C. § 1223. Alternately, she also argues that the one-year time period should have been tolled from September 9, 2001 until November 2001, when the I-863

form was finally filed with the immigration court. Finally, and again in the alternative, she argues that her oral request for asylum at the airport and its memorialization in the I-863 form was enough to satisfy the statutory requirements of 8 U.S.C. § 1158(a)(2)(B). These are, of course, all questions of law.

But Zeqiri did not raise any of these arguments before the immigration judge. They do not appear in her notice of appeal to the Board or in the brief in support of her appeal. Under the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), Pub. L. No. 104-208, 110 Stat. 3009-546 (1996), a failure to exhaust administrative remedies generally precludes our review. *See* 8 U.S.C. § 1252(d)(1). Zeqiri claims that the scope of this exhaustion requirement is extremely narrow. In essence, she argues that it only requires her to appeal the immigration judge's decision to the Board and obtain a final, adverse decision before resorting to federal court. We believe that it requires more than that. Courts have almost universally interpreted § 1252(d)(1) to require that specific legal issues be presented to the Board for its consideration. *See Ramani v. Ashcroft*, 378 F.3d 554, 559 (6th Cir. 2004); *Theodoropoulos v. INS*, 358 F.3d 162, 171 (2d Cir. 2004); *Marrero v. INS*, 990 F.2d 772, 779 (3d Cir. 1993); *Alvarez-Flores v. INS*, 909 F.2d 1, 8 (1st Cir. 1990); *Farrokhi v. INS*, 900 F.2d 697, 700 (4th Cir. 1990); *Vargas v. INS*, 831 F.2d 906, 907-08 (9th Cir. 1987); *Youssefinia v. INS*, 784 F.2d 1254, 1258 (5th Cir. 1986).

This rule makes perfect sense. If the Board is to serve its function as a primary interpreter of the INA, it must be given the first opportunity to pass upon questions of law presented by the Act. *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 424-25, 119 S. Ct. 1439, 143 L. Ed. 2d 590 (1999);

*INS v. Cardoza-Fonseca*, 480 U.S. 421, 448, 107 S. Ct. 1207, 94 L. Ed. 2d 434 (1987). Congress, of course, delegated the broad authority to implement and enforce federal immigration law to the Attorney General. *See* U.S.C. § 1103(g)(2) (2006). The Attorney General has, in turn, delegated the power to interpret the INA to the Board. *See* 8 C.F.R. § 1003.1(d)(1). The Board's special expertise in interpreting the INA is particularly helpful given the Act's intricate and often Byzantine structure. *See McCarthy v. Madigan*, 503 U.S. 140, 145 112 S. Ct. 1081, 117 L. Ed. 2d 291 (1992). Zeqiri was required to give the Board an opportunity to pass upon the particular legal arguments and contentions that she now raises. *See Korsunskiy v. Gonzales*, 461 F.3d 847, 849 (7th Cir. 2006); *Abdelqadar v. Gonzales*, 413 F.3d 668, 670-71 (7th Cir. 2005). Because Zeqiri did not exhaust her remedies, her newly raised arguments are deemed waived and this portion of her petition is dismissed for want of jurisdiction.[2] *See* 8 U.S.C. § 1252(d)(1).

### III.

Despite the untimeliness of her asylum application, Zeqiri is still eligible for withholding of removal. *See* 8 C.F.R. § 208.3(b). We must bear in mind, however, that the Board rejected Zeqiri's argument that she was eligible

---

[2] The failure to exhaust is also fatal to Zeqiri's constitutional claim. Although petitioners are not required to raise constitutional claims that the Board is powerless to address, *see Feto v. Gonzales*, 433 F.3d 907, 912 (7th Cir. 2006), they are required to raise constitutional claims based on "procedural failings" that the Board could have remedied, *see Pjetri*, 468 F.3d at 481.

for withholding. Thus, Zeqiri "must show that 'the evidence not only supports that conclusion, but compels it.'" *See* 8 U.S.C. § 1252(b)(4)(B).

An alien may not be removed from the United States "if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. 1231(b)(3)(A). The standard for withholding of removal is higher than the standard for a grant of asylum. *See Firmansjah v. Gonzales*, 424 F.3d 598, 604-05 (7th Cir. 2005). To succeed on a withholding of removal claim, an alien "must demonstrate a 'clear probability' that he or she will face persecution in the country to which he or she will be removed*." Id.* at 605.

Typically, the applicant attempts to establish that she was subject to past persecution; from this fact, one may presume that she will be subject to future prosecution. *See BinRashed v. Gonzales*, 502 F.3d 666, 670-71 (7th Cir. 2007). Persecution entails "punishment or the infliction of harm for political, religious, or other reasons that this country does not recognize as legitimate." *DeSouza v. INS*, 999 F.2d 1156, 1158 (7th Cir. 1993). Not every hardship will suffice; there must be a showing that an alien was "singled out" or otherwise "personally" persecuted. *See Tamas-Mercea v. Reno*, 222 F.3d 417, 427 (7th Cir. 2000); *Sayaxing*, 179 F.3d at 520; *see also* 8 C.F.R. § 208.13(b)(2)(i). Thus, "conditions of political upheaval which affect the populace as a whole or in large part are generally insufficient to establish eligibility for asylum." *Gonzalez v. INS*, 77 F.3d 1015, 1021 (7th Cir. 1996); *accord Ahmed v. Gonzales*, 467 F.3d 669, 673 (7th Cir. 2006); *Koval v. Gonzales*, 418 F.3d 798, 805-06 (7th Cir. 2005); *Sivaainkaran v. INS*, 972

F.2d 161 (7th Cir. 2004). The INA "does not insure aliens against unrest or civil war in their homelands." *Kobugabe v. Gonzales*, 440 F.3d 900, 902 (7th Cir. 2006). If it did, "the entire population of many war-torn nations [would qualify] for asylum." *Sivaainkaran v. INS*, 972 F.2d 161 (7th Cir. 1992).

This principle creates quite a problem for Zeqiri, who by her own admission was a farm worker who was not engaged with any political group or organization. She was not a part of the insurgency, nor was she a political activist or a student. Zeqiri's experiences might reflect the general hardships faced by ethnic Albanians, but a fear of ethnic persecution "common to all members of an ethnic minority" is generally insufficient.[3] *Petrovic v. INS*, 198 F.3d 1034, 1037 (7th Cir. 2000). Thus, Zeqiri must present some evidence of particularized or personal persecution.

Zeqiri's best evidence of personal persecution was her arrest at the University of Tetova. She testified that she was personally threatened by Macedonian security officers. The immigration judge, however, ruled that Zeqiri's testimony was not credible on this point, for it contradicted the answers she gave at the Miami airport. There is no question that Zeqiri understood the question; she now claims that she did not tell the truth because she was frightened by her encounter with INS officials. But the immigration judge is not required to

---

[3] We should also note at this point that Zeqiri has made no argument that ethnic Albanians in Macedonia are subject to a "pattern or practice" of persecution, a finding that might lessen her obligation to show that she would be "singled out individually for persecution." *See* 8 C.F.R. § 208.13(b)(2)(iii).

accept the petitioner's explanation for "plain inconsistencies" in her story. *Feto*, 433 F.3d at 911.

Once the arrest is removed from the picture, Zeqiri lacks evidence of personal persecution. The bombing incident on the train was certainly traumatic but she was not the intended target. It appears that she was simply in the wrong place at the wrong time. Further, there is no evidence that Macedonian security forces singled out her house; they surrounded and intimidated much of the village. Similarly, although her home may have been destroyed and her land occupied, there is no evidence that this was not simply an incident in the larger conflict. Zeqiri simply cannot show personal or particularized persecution, so her claim for withholding of removal fails.

Zeqiri also claims that she is entitled to deferral of removal under the Convention Against Torture, but this claim is frivolous, as Zeqiri has no evidence to show that it is "more likely than not" that if removed to Macedonia, she will be subjected to torture. *Boyanivskyy v. Gonzales*, 450 F.3d 286, 292 n.3 (7th Cir. 2006); *Dandan v. Ashcroft*, 399 F.3d 567, 575 n.7 (7th Cir. 2003).

## IV.

For the reasons discussed above, we dismiss the petition for lack of jurisdiction to the extent it challenges the timeliness of the asylum application. We deny the rest of the petition because the Board's decisions were supported by substantial evidence.