In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 07-2369

SAIDU SANKOH,

*Petitioner,*

*v.*

MICHAEL B. MUKASEY, Attorney
General of the United States,

*Respondent.*

———————

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A76-645-986

———————

ARGUED APRIL 14, 2008—DECIDED AUGUST 13, 2008

———————

Before FLAUM, EVANS, and TINDER, *Circuit Judges*.

FLAUM, *Circuit Judge*. Saidu Sankoh is a native of Sierra Leone seeking asylum, withholding of removal, and relief under the Convention Against Torture. An immigration judge denied his applications and ordered him removed. The Board of Immigration Appeals concurred in the immigration judge's conclusion and dismissed Sankoh's appeal. Sankoh then moved to this Court, challenging the agency's decision under several theories. Finding no error, we affirm.

## I. Background

Saidu Sankoh is a Sierra Leonean national who arrived in the United States in 1996. When his visitor's visa expired in early 1997, the INS issued him a notice to appear charging him with being removable under 8 U.S.C. § 1227(a)(1)(B). After a number of extensions not relevant here, his removal proceedings finally began in 2005. There, Sankoh conceded his removability and requested relief in the form of withholding of removal, asylum, and protection under Article 3 of the Convention Against Torture. The immigration judge conducted two hearings for these claims in January and June 2005 during which Sankoh testified and submitted a number of documents to substantiate his requests for relief. The court's inquiry centered on Sankoh's experiences prior to leaving Sierra Leone and what treatment he could expect should he return.

Much of the evidence came from Sankoh's testimony. His story was one charted by the political currents of Sierra Leone—retold below as he presented it, with modifications where necessary. Sankoh told the court that he was born in 1946 to a family of some political prominence. In 1970, when political conditions in the country deteriorated, Sankoh's family sent him to safety in Germany. He spent fourteen years there, marrying a German woman, fathering a child with her, learning the language, and obtaining German residency. But after he divorced his German wife in 1984, he returned to Sierra Leone, where he set up shop as a printer in the country's capital, Freetown. Soon the political turmoil that had forced Sankoh from Sierra Leone would flare anew, only this time much of it would be caused by Sankoh's uncle, Foday Sankoh, and the rebel group that he led, the Revolutionary United Front.

The RUF was a rebel group bent on overthrowing Sierra Leone's government, although it did not espouse any particular ideology. The group was led by Foday Sankoh, supported by the now-deposed Liberian president Charles Taylor, and was responsible for Sierra Leone's decade-long civil war. The brutal war was notable for the use of child soldiers, the atrocities committed—including the widespread practice of amputation and mutilation against civilians—and the interplay between the war and the country's valuable diamond mines. *See generally* Barbara Crossette, *Sierra Leone Rebel Leader Reportedly Smuggled Gems*, N.Y. TIMES, May 14, 2000; Howard W. French, *African Rebel With Room Service*, N.Y. TIMES, Jun. 23, 1996; *see also* ISHMAEL BEAH, A LONG WAY GONE: MEMOIRS OF A BOY SOLDIER (Farrar, Straus & Giroux 2007).

This case turns on Sankoh's involvement with his uncle and the RUF from 1992 through 1994. Sankoh could not deny his connection to the group, but he sought to prove before the immigration court that he was an unwilling conscript to the RUF's operations, a version of events that the immigration judge and Board ultimately found to be incredible. As Sankoh described it to the court, his uncle and a band of RUF soldiers first asked him to help the cause in 1992. He testified that they wanted his help moving "something" from abroad into Sierra Leone. Sankoh told the immigration judge that his confronters were purposefully opaque in describing what this "something" was; as his asylum application recounted things, however, they told him he would be procuring guns. In any event, Sankoh's uncle considered him the perfect candidate for transacting business abroad. He had a "valid passport to travel to Europe," which meant he could travel freely throughout the continent. And his Sierra Leonean citizenship meant that he could import

goods into the country as well, something a foreigner could not do. In short, he was someone that could function on both sides of a European transaction—both in helping to procure goods abroad and in shepherding them into Sierra Leone. Sankoh told the immigration judge that he initially refused the offer. But after his uncle struck his foot with the butt of a rifle and threatened further "consequences" if he did not cooperate, he acquiesced. He also submitted that he went along because, if he did not, "the rebels would kill me because they had disclosed important secret information (such as hide-outs) to me when 'requesting' my help to buy weapons."

Eight trips to various points in Europe would ensue, and, according to Sankoh, they all followed the same script. The RUF would make all the arrangements, and his escort would be an Eastern-European man named Alex, who met Sankoh along his path to Europe. Alex would then drop Sankoh off at a hotel, take his passport, and leave him until all the shipments had been arranged. He said that he never left the hotel or entertained options of fleeing because he thought he was being watched. Instead, he would stay in his hotel room most of the time he was away, and at some point Alex would reappear, transaction complete, and tell Sankoh it was time to go. When he arrived back in Sierra Leone, he would then have to pick up a shipment in his name at customs. Sankoh claimed never to have known exactly what was in the shipment. Someone in the RUF told him it was "second-hand tires," although he surmised that it was either "weapons, or medical supplies." At one point he read the word "rifles" in Dutch along the side of one parcel, which he understood due to its similarity to German. As mentioned above, however, this version is in tension with his asylum applica-

tion where he claimed he was told the content of the shipments from the outset. Once through customs, Sankoh would then help get the "supplies to the rebels in the bush" or, as he described his treatment, the RUF would use him as a "pack animal[] to carry supplies."

Sankoh claimed that his relationship with the RUF soured after his eighth and last trip to Europe when he was attacked by several of the group's members. After stopping for the night while transporting a shipment to rebel troops, someone threw scalding water on his back and four RUF members then gang-raped him. He told the immigration judge that the rape was so forceful that he needed to later undergo surgery to fix an inguinal hernia that had resulted. Immediately after his rape, Sankoh received some comfort from an RUF member who was also moving materiel through the bush. The person was able to speak German and, when he heard what had happened to Sankoh and that he was planning to escape, gave him some advice on the best way to do it. Sankoh said that he made his move: marching through the bush, flagging down a truck on a nearby road, and making his way back to Freetown. Once in Freetown, Sankoh says that he received help leaving the country from a friend at the airport, Shaka Kanu. Kanu gave him an airplane ticket and some cash, and, on February 6, 1994, he left Sierra Leone bound for Europe.

After a brief detour through Belgium, Sankoh arrived by train in Frankfurt, Germany. There, he learned that the German government had revoked his residency due to the length of his absence. And when he requested asylum, his request was denied. Sankoh was able to remain in Germany for nearly two-and-a-half years, during which time, he said he received medical treatment for malaria, high

blood pressure, and the hernia that he claims resulted from the rape. But after the German government denied all of his requests to remain, Sankoh left for the United States in July 1996, eventually overstaying his visa and receiving the notice to appear.

To support his testimony, Sankoh also provided medical records of his surgery in Germany to show his inguinal hernia. He also gave the court two letters from two men in Sierra Leone—one, Abu Koroma, claiming to be the RUF member who helped him escape after his rape and another, Dr. Kanu, saying he was Sankoh's "close friend." The two claimed to know each other. Koroma, who had helped Sankoh escape after his rape, said that he learned Sankoh's identity when he was visiting Dr. Kanu for treatment. The doctor had a picture of Sankoh on a wall, and when Koroma saw it, he recognized Sankoh from the jungle and recounted the story of his escape. The letters submitted to the court told the story of this seren-dipitous encounter as well as the details surrounding Sankoh's rape.

Sankoh also claimed that the Sierra Leonean govern-ment would imprison him should he return. He based this claim on what he said had happened to his family after he left. According to Sankoh, soon after he left Sierra Leone, his mother's house was firebombed and destroyed, apparently in an effort to target his cousin. Sankoh provided letters from a friend and the family lawyer describing the bombing, the government's efforts to find Sankoh's children, and the government's threats that Sankoh would meet a similar fate if he returned. He also claimed that the government had been searching for him in his former apartment in Freetown since he left; officials thought that he had been a gunrunner for

the RUF, meaning he would be arrested and imprisoned if he ever returned.

At the end of the hearing and just prior to closing arguments, Sankoh's attorney objected to the immigration judge's decision not to admit a State Department country report for Sierra Leone from 1993. From 1997 through the proceedings in 2005, Sankoh had submitted a number of documents setting out the country conditions in Sierra Leone for the years in which he was living there. The immigration judge who would ultimately hear Sankoh's case had a 100-page limit on documentary evidence, and Sankoh's counsel was unsure as to whether these previously submitted documents would count against this limit. Efforts to clarify the court's position on the limit failed. And when proceedings began, Sankoh's counsel submitted 65 pages of documents focusing on the country conditions in Sierra Leone since his original application for asylum—essentially an update to the previously submitted documents. When the immigration judge later told Sankoh's attorney that the previous documents were not on file, she did not object, instead proceeding apace with Sankoh's case. After Sankoh had presented his case, the judge asked whether "there [was] any other document that hasn't been considered that you want me to consider," and Sankoh's attorney indicated that there was not. The immigration judge then told the parties what issues he wanted addressed in closing arguments. These included Sankoh's credibility, his claimed past persecution, and whether he was a persecutor of others. Sankoh's attorney asked to supplement the record with the country reports from 1992 and 1993—the period during which Sankoh was making his trips to Europe—but the judge refused, saying the "case [was] closed for decision."

In his written opinion, the immigration judge denied all of Sankoh's requests for relief. As is relevant here, the court first found that Sankoh was statutorily ineligible for asylum because he "assisted or otherwise participated in the persecution" of others. In the court's estimation, Sankoh had admitted to traveling to Europe in order to assist the RUF's acquisition of weapons, which the RUF subsequently used. And the court did not believe Sankoh's claim that he stayed in the hotel room the entire time while others conducted the transactions. Alternately, the court found Sankoh's testimony incredible, discounting nearly every aspect of Sankoh's testimony. As to the arms purchases, the court reasoned that a group like the RUF would not "hesitate[] in fabricating documents," making Sankoh's ability to freely travel to Europe less useful. And the court did not credit Sankoh's version of the rape. The court noted that he had provided different dates for the rape in his original application for asylum and his testimony. Also, the facts that Sankoh was the nephew of the RUF's leader and had been "entrusted with the important task of obtaining weapons" made a rape by the RUF rank-and-file unlikely. Nor did the court believe that Sankoh was entirely unaware of the purpose of his trips to Europe. Although he testified that he only had suspicions as to what he was helping to transport, in his original application for asylum, he stated that the rebels had come to his home to "'ask[]' me to help them buy armaments in Europe." The court then questioned the letters from Koroma and Dr. Kanu and the circumstances of their conversation regarding Sankoh. Finally, the court noted that the conditions in Sierra Leone had improved and that Sankoh had no evidence that he would be persecuted upon his return. With a dearth of credible evidence before it, the court denied his various requests for relief and ordered him removed.

Sankoh then challenged the immigration judge's decision before the Board of Immigration Appeals, which dismissed his appeal. Expanding upon the immigration judge's decision, the Board similarly found him ineligible for asylum as a persecutor, reasoning that he had admitted in his original asylum application that he went to Europe to assist in procuring arms. The Board also upheld the adverse credibility finding. The inconsistencies between Sankoh's initial application and his testimony made his claim that the RUF forced him to go to Europe implausible. The Board otherwise agreed with the immigration judge's rejection of Sankoh's documentary evidence regarding the rape, including the medical evidence and the letters from Koroma and Dr. Kanu. And the Board found that the evidence failed to prove that Sankoh would face persecution if he returned to Sierra Leone. Finally, the Board held that the immigration judge did not deny Sankoh of due process either when he examined him during the proceeding or when he refused to admit the 1993 Country Report into the record. As to this last point, the Board then took administrative notice of the 1993 country report. In his brief before that court, Sankoh had described the RUF as relatively new at the time of his involvement. Based on the report, however, the Board concluded that Sankoh had "mischaracterize[d] the status of the RUF [at that time] as 'nascent'" and stated instead that, at that time, "[t]he RUF was committing horrible atrocities against civilians and aid worker[s] and was already engaged in conscripting child soldiers." This appeal followed.

## II. Discussion

On appeal, Sankoh raises a host of challenges to the proceedings before the immigration judge and the Board.

First, he claims that he was denied due process (i) through the immigration judge's decision not to admit the 1992 and 1993 country reports into the record; (ii) through the Board's ultimate (and in his view erroneous) reliance on the 1993 report on appeal; and (iii) as a result of the immigration judge's bias against his case. In addition, he argues that the Board erred in upholding the immigration judge's adverse credibility findings. He also argues that the Board erred in holding that Sankoh was ineligible for asylum as a persecutor of others. Finally, Sankoh challenges the Board's conclusions that he had failed to show past persecution or a fear of future persecution for purposes of his asylum, withholding of removal, and Convention Against Torture claims. The following sections discuss why the agency did not err in denying his requests for relief.

### A. Procedural Claims

Sankoh raises three procedural challenges to the immigration judge's handling of his hearing. He argues first that the immigration judge erred in refusing to admit the country reports from 1992 to 1994. In addition, he argues that the Board compounded this error when it improperly took administrative notice of the facts contained in the 1993 report. Finally, Sankoh claims that the immigration judge violated his due process rights by exhibiting bias against his application.

These procedural arguments involve an amalgam of constitutional and statutory claims. Aliens have procedural due process rights under the Fifth Amendment, and this Court will enforce the entitlements set out there when necessary. *Reno v. Flores*, 507 U.S. 292, 306 (1993). But

the statutes and regulations governing procedures before the INS provide a number of rights to an alien, and we have held that these guarantees, if secured, provide constitutionally adequate process. *See, e.g.*, *Khan v. Mukasey*, 517 F.3d 513, 517 (7th Cir. 2008). Given the canon of constitutional avoidance, the upshot is that "aliens are better-served by arguing . . . that immigration proceedings infringed [some] statutory [or] regulatory right"—not that the proceedings fell short of what the constitution requires. *Id.* And in the event that there is no statute or regulation on point, only then will this Court turn to whether the process afforded passed constitutional muster. As with most alleged procedural violations, after a showing is made, the question becomes whether the violation prejudiced his application in any meaningful way. *Hussain v. Keisler*, 505 F.3d 779, 781 (7th Cir. 2007).

Sankoh's first claim is that the immigration judge violated his statutory right to a "reasonable opportunity . . . to present evidence on [his] own behalf" when it refused to reopen the record to admit the country reports from 1992 to 1994. *See* 8 U.S.C. § 1229a(b)(4)(B); 8 C.F.R. § 1240.10(a)(4). Sankoh presented these country reports after learning what the immigration judge wanted counsel to discuss during closing arguments. The BIA rejected this claim because the immigration judge had asked Sankoh's counsel whether she had anything to add to the record before closing it, and Sankoh's counsel responded in the negative. Because this is a legal conclusion, we review it de novo and agree that the judge's evidentiary decision did not deprive Sankoh of his "rea-

sonable opportunity" to provide evidence.[1]

Sankoh originally received his notice to appear in 1997. During the ensuing eight years, Sankoh, represented by counsel, submitted several documents to the court to substantiate his claim of asylum. Sankoh's claim arises because the documents that he submitted regarding the country conditions in Sierra Leone from the early 1990s were not in the record at the beginning of his 2005 proceedings. After the immigration judge told his counsel this fact, however, she made no effort to introduce the documents into the records during the hearing. In his brief before this Court, Sankoh states that his counsel considered the issue "moot" when learning that the previous documents pertaining to country conditions were not in the file; that is, she made no effort to press the matter. Sankoh thus had the "opportunity" to present the evidence he now claims was unfairly rejected.

---

[1] Our conclusion rests entirely upon the examination of whether Sankoh in fact had the statutorily entitled "opportunity." The immigration judge's decision not to reopen the evidence so as to admit the country reports was a quintessentially discretionary action. *See* 8 C.F.R. § 1003.31(c) ("The Immigration Judge may set and extend time limits for the filing of applications and related documents and responses thereto, if any."). Thus, this Court is without jurisdiction to review whether the immigration judge should have reopened the evidence. 8 U.S.C. § 1252(a)(2)(B)(ii); *see also, e.g.*, *Ali v. Gonzales*, 502 F.3d 659, 660 (7th Cir. 2007); *Subhan v. Ashcroft*, 383 F.3d 591, 595 (7th Cir. 2004) ("[O]rders denying motions for continuances, like other orders governing the management of trials, are traditionally and indeed inevitably discretionary in character.").

He simply did not take advantage of it. *Capric v. Ashcroft*, 355 F.3d 1075, 1089 (7th Cir. 2004). Further, when the immigration judge gave the parties an opportunity to add more documentation prior to closing the record, Sankoh's counsel again passed on the offer. There was nothing stopping Sankoh's counsel from submitting these documents anew during the proceeding. Thus, Sankoh had his "reasonable opportunity . . . to present evidence on [his] own behalf."

Next, Sankoh argues that the Board erred in taking administrative notice of the country conditions in Sierra Leone in 1993. In rejecting his appeal, the Board took "administrative notice of the 1993 State Department Report" to conclude that Sankoh had "mischaracterize[d] the status of the RUF in that report as 'nascent'" and to substantiate the alleged abuses the RUF had committed. Sankoh challenges this on two grounds. First, he claims that the Board violated his due process rights by taking notice of a fact to which he did not have an opportunity to respond. We do not agree. The Board has the authority to take administrative notice of "uncontroverted facts," meaning facts "that can be characterized as 'commonly acknowledged.'" *Kaczmarczyk v. I.N.S.*, 933 F.2d 588, 594 (7th Cir. 1991). *Id.*; *Rhoa-Zamora v. I.N.S.*, 971 F.2d 26, 36 (7th Cir. 1992). But, as mentioned, due process affords an alien an "opportunity to be heard," which extends to the specific facts grounding the agency's decision to remove him. *Kaczmarczyk*, 933 F.2d at 594. One could claim, as Sankoh does here, that the immigration judge's ability to make certain factual determinations outside of the adversarial process—in which the alien exercises his "opportunity to be heard"—falls short of due process. As we have held many times, however, admin-

istrative notice does not violate the alien's due process rights because an alien can challenge any factual finding through a motion to reopen. *Id.*; *see also Rhoa-Zamora v. I.N.S.*, 971 F.2d 26, 33-34 (7th Cir. 1992). As far as our review of the briefs and the record indicate, Sankoh did not file a motion to reopen. Nor did the Board deny him an opportunity to file one or render the opportunity meaningless through cursory review. *Rhoa-Zamora*, 971 F.2d at 34 n.8. Thus, Sankoh's broadside challenge must fail.

Sankoh also claims that the Board's official notice of the facts in the 1993 country report denied him due process because the Board took official notice of a fact that the parties disputed.[2] He says that whether the RUF was in fact engaged in atrocities when he was making his trips to Europe was a heavily contested issue. In turn, the administrative notice of this fact prejudiced him because it ultimately supported the Board's conclusion that he had persecuted others. We do not agree. The Board was well

---

[2] Sankoh also claims that the Board mischaracterized the 1993 country report. In his estimation, the report did not indicate that the RUF was involved in the atrocities pinned on it by the Board. Aside from lacking merit—the report provides ample support for the Board's conclusions regarding the RUF—it is a substantive and not a procedural claim. Whether the Board reached the appropriate conclusion at the end of a fair process concerns whether "substantial evidence" supported the Board's conclusion, not the constitutional adequacy of the process afforded. *See Capric*, 355 F.3d at 1089 (rejecting "attempt to cloak a substantial evidence challenge to the IJ's decision in due process constitutional garb"). As a result, we reject this theory as well.

within its authority to credit the 1993 country report's findings regarding the RUF. As we have noted, the use of country reports is not entirely unproblematic. Due process demands an individualized assessment of each asylum applicant. *Kaczmarczyk*, 933 F.2d at 594; *Petrovic v. I.N.S.*, 198 F.3d 1034, 1037 (7th Cir. 2000) (Asylum application depends on existence of "specific facts demonstrating that he has actually been the victim or persecution or has good reason to believe that he will be singled out for persecution."). And unthinking reliance on general country conditions without linking those conditions to the applicant for asylum would undermine the individualized nature of the inquiry. *Kilokoqi v. Gonzales*, 439 F.3d 336, 343 (7th Cir. 2005) ("State department reports are entitled to deference, but the IJ must make an individualized determination."); *Diallo v. Ashcroft*, 381 F.3d 687, 700 (7th Cir. 2004); *Begzatowski v. I.N.S.*, 278 F.3d 665, 671 (7th Cir. 2002); *cf. generally Bi-Metallic Inv. Co. v. State Board of Equalization*, 239 U.S. 441, 445 (1915). Not to mention the fact that considerations of diplomacy may shade the analysis offered by the State Department, perhaps making it less than bedrock in its detailing of human rights abuses. *Niam v. Ashcroft*, 354 F.3d 652, 658-59 (7th Cir. 2004). For these reasons, in some circumstances, denying asylum to an individual solely based on the generalized statements in the report may not afford the meaningful "opportunity to be heard" required by due process.

But that is not what happened here. The 1993 country report provided evidence of the "political conditions in [Sankoh's] home country," *Kaczmarczyk*, 933 F.2d at 594, which is a suitable topic for notice. *See Margos v. Gonzales*, 443 F.3d 593, 598 (7th Cir. 2006) (noting in passing that "[t]he immigration judge took administrative notice of the

fact that the Hussein regime and its control of Iraq ceased as of April 2003"). In addition, the facts contained in the country report were not "controverted" in the sense that Sankoh had credible evidence to the contrary. *See, e.g.*, *Niam*, 354 F.3d at 658-59. In fact, he testified that he knew that the RUF was "a group which had already started attacks against the civilian population" when he agreed to take "business trips" to Europe. And of course the 1993 report was one of the three country reports Sankoh sought to admit after the close of evidence. So he cannot realistically claim error from the Board's accurate representation of the facts in a report he sought to admit. As a result, this claim fails as well.

Sankoh's final procedural argument is that the immigration judge exhibited impermissible bias towards his claims. He argues that the judge went beyond his role when he aggressively questioned Sankoh, became "hostile" and "impatient" during Sankoh's testimony, and "commandeered cross-examination." This, he claims, was an abdication of the neutrality expected of immigration judges and denied him due process. Once again, we disagree. Unlike Article III courts, an immigration court is a more inquisitorial tribunal. Congress has given immigration judges the authority to "interrogate, examine, and cross-examine the alien and any witnesses." 8 U.S.C. § 1229a(b)(1). Immigration judges are thus not bound by all of the formalities that typify other adjudicative proceedings. But this authority, though broader, has its limits. The judge's "discretion [in questioning] is bounded by the applicant's right to receive a fair hearing." *Podio v. I.N.S.*, 153 F.3d 506, 509 (7th Cir. 1998). And when the immigration judge's treatment of the applicant crosses the line between his authority under § 1229a(b)(1) and unfairness, a due process violation has occurred. *Id.*

Here, the record just does not support Sankoh's claim that the judge crossed the line. The judge's questioning began only after Sankoh's attorney had first examined him at length. Thus, Sankoh had an uninterrupted opportunity to be heard before the judge took over the proceedings. In addition, when the judge's questioning did begin, it was not hostile. The interruptions that Sankoh points to were simply efforts to keep the testimony moving "in what [the judge] thought was the right direction." *Bereza v. I.N.S.*, 115 F.3d 468, 473 (7th Cir. 1997). For example, when the judge asked "where and how [the RUF's] operations [were] conducted," Sankoh responded that "they come to Kilon, the town named Kilon [and t]hey destroy there." The judge then cut Sankoh short to redirect the questioning, saying that he would "repeat the question again because you're not really answering it." These interruptions reveal an effort to keep the testimony moving, not an impermissibly biased tribunal. *Iliev v. I.N.S.*, 127 F.3d 638, 643 (7th Cir. 1997). Although the judge may have been testy at points with both Sankoh and his attorney, due process does not constitutionalize good manners. In sum, the immigration judge did not deny Sankoh a fair hearing, and his claim must therefore fail.

## B. Substantive Claims

Sankoh raises several challenges to the rejection of his requests for asylum, withholding of removal, and relief under the Convention Against Torture. The Board adopted and expanded upon the immigration judge's decision to deny all of Sankoh's requests for relief, making the Board's the decision we review for "substantial evidence." *See Feto v. Gonzales*, 433 F.3d 907, 910-11 (7th Cir. 2006). This

standard of review means that "we assess whether the BIA's determination was 'supported by reasonable, substantial, and probative evidence on the record considered as a whole,' and reverse only if the evidence compels a contrary conclusion." *Tapiero de Orejuela v. Gonzales*, 423 F.3d 666, 671 (7th Cir. 2005). Based on that review, we find adequate support for the Board's decision. The Board rejected Sankoh's requests on a number of grounds. On appeal, however, it is only necessary for us to look at two: the adverse credibility finding and the lack of proof that, if Sankoh was treated poorly in the past or if likely to be treated poorly in the future, it was not the result of Sankoh's political views.[3]

Before delving into the particulars, an overview of the relationship between Sankoh's three claims is in order as the factual bases for the claims overlap substantially. An alien qualifies for asylum if he can show that he is a "refugee." 8 U.S.C. § 1158(b)(1)(A). The INA defines a refugee as a person who is "unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). If an alien establishes past persecution, there is a rebuttable presumption of future persecution. To still deport the alien, the government must then show that country conditions have changed, meaning

[3] The Board also found that Sankoh was ineligible for asylum because he was a persecutor of others. Because we accept that his lack of credibility and his failure to prove likely persecution suffice, we do not reach this issue and expressly decline to adopt this rationale.

the past persecutors are no longer able to do so. 8 C.F.R. § 1208.13(b)(1). Similarly, an alien must receive withholding of removal "if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). To qualify, the alien has to show a "clear probability" that he will face persecution if removed. *Zeqirir v. Mukasey*, 529 F.3d 364, 371 (7th Cir. 2008). Finally, to qualify for relief under the Convention Against Torture, an alien must show that it is more likely than not that he will be tortured if removed to the proposed country of removal. 8 C.F.R. § 208.16(c)(2). Notably, these latter two showings are more difficult than proving that one is a "refugee." *See Zeqirir*, 529 F.3d at 371; *Hussain v. Gonzales*, 424 F.3d 622, 630 (7th Cir. 2005). As a result, a failed asylum claim—more specifically, a finding that an alien does not have a "well-founded fear of future persecution"—will eliminate both the withholding of removal and Convention Against Torture claims as well. *Id.* Here, Sankoh's claim for asylum falls—and thus his remaining claims necessarily fall as well—because there is no credible evidence of past persecution and no evidence establishing a "well-founded fear of persecution." The following sections discuss each in turn.

### 1. Past Persecution

Sankoh's claim of past persecution involves his treatment by the RUF from 1992 to 1994. Specifically, he identifies two acts of past persecution: the RUF conscripted him into service running guns from Europe and members of the RUF then gang raped him at one point while he

was transporting arms to a rebel camp. The Board rejected both. First, it adopted the immigration judge's adverse credibility finding, which largely discredited Sankoh's version of events. For example, although Sankoh claimed in his testimony that he was unaware of the precise content of the shipments, he stated in his application for asylum that he was told from the start that he was going to get guns. In addition, the Board found it implausible that Sankoh would be oblivious to the RUF's objectives when he was sent to Europe. He had professed a familiarity with their aims elsewhere in his testimony, and his claim that they sent him to Europe for "second-hand tires" did not make sense given their ambitions. The Board also found Sankoh's account of the rape to be not credible. The Board noted discrepancies in the dates and circumstances surrounding the rape. And the Board found it implausible that the RUF's rank-and-file would rape the nephew of their leader who was running guns for the group. Nor was the Board persuaded by the documentary evidence; the medical records from Sankoh's surgery did not indicate that the rape caused his injuries, and the letters from Koroma and Dr. Kanu lacked sufficient indicia of reliability. Finally, the Board noted that nothing in Sankoh's account indicated that, even if the events did occur as he stated, the RUF persecuted him on account of his membership in a protected group.

On appeal, Sankoh first argues that the Board should not have relied on many of these inconsistencies in finding him not credible because Sankoh did not have an opportunity to explain them away first. The inconsistencies arose between his original asylum application, the affidavit included with the application, and his testimony. The immigration judge's adverse credibility

finding came after his testimony, and the judge did not flag the apparent consistencies and ask for an explanation before issuing his opinion. This silence, Sankoh claims, was error. In support of this proposition, he points the Court to a decision from the Second Circuit, which, he claims, holds that such an opportunity is required before an adverse credibility finding. *See Ming Shi Xue v. BIA*, 439 F.3d 111, 121 (2d Cir. 2005). This claim is unavailing.

In the first place, we do not think *Ming Shi* advances Sankoh's position. There, the immigration judge found the applicant not credible based on inconsistencies in the applicant's testimony. The Second Circuit held that the immigration judge's failure to give the applicant an opportunity to explain these discrepancies was error. The court differentiated the inconsistencies at issue there—where "plausible explanations [we]re possible"—from those where the discrepancies were "obvious to everyone." *Id.* at 127-28. After concluding that "[e]ach of the[ inconsistencies] allowed for a plausible explanation," the court remanded so that the applicant would have a chance to explain. *Id.* at 127. Thus, the case stands for the proposition that before the Board can rely on non-glaring inconsistencies, the applicant must be given an opportunity to explain any tension that might exist between facts.

As will be seen, the inconsistencies noted by the agency in Sankoh's case are both fairly "obvious" and material. But, more importantly, this Court has steered clear of this type of analysis when examining the adequacy of the agency's credibility determinations. Instead, we are generally deferential to the immigration judge's and the Board's credibility findings as long as they are "supported by 'specific, cogent reasons.'" *Diallo v. Gonzales*, 439 F.3d 764, 766 (7th Cir. 2006). If the immigration

judge relies on minor or tenuous inconsistencies to find
an applicant not credible, the judge's finding is not likely
based on "substantial, and probative evidence"—regard-
less whether the applicant had a chance to explain the
inconsistencies. *Jalloh v. Gonzales*, 423 F.3d 894, 898 (7th Cir.
2005); *see also Kadia v. Gonzales*, 501 F.3d 817, 821 (7th Cir.
2007) ("If any such pratfall warranted disbelieving a
witness's entire testimony, few trials would get all the
way to judgment."). Asylum hearings are human events,
and individuals make mistakes about immaterial points.
*Id.* Basing an adverse credibility finding on these kinds
of mistakes appears to be more of a game of "gotcha" than
an effort to critically evaluate the applicant's claims. *Id.* It
may be true that the failure to explain a minor inconsis-
tency will weaken an applicant's case; and so providing
such an opportunity could in turn strengthen the agency's
reasoning. *See Shtaro v. Gonzales*, 435 F.3d 711, 716 (7th Cir.
2006) ("[A]dverse credibility determinations may not be
based on minor discrepancies that are easily explained . . .,
and the IJ did not attempt to ascertain whether these
omissions could be accounted for."). But we have not
required a remand when an immigration judge fails
to provide such an opportunity, and we decline to do
so here.

Sankoh also claims that the alleged inconsistencies are
insufficient to support the Board's adverse credibility
finding. The Board discounted Sankoh's credibility
based on his testimony and the documentary evidence
submitted as part of his application. Although the "stan-
dard of review remains the same," a "reviewing court is
in a better position to decide whether the credibility
determination was reasonable if the determination was
based entirely on documentary evidence." *Kadia*, 501

F.3d at 820. Here, we have no difficulty concluding that it was. Sankoh portrayed himself as an unwitting participant in the RUF's gun-running. During his testimony, he stated that the RUF "didn't tell me what they were buying" when he would make his trips to Europe. He also said that he "didn't know" that the RUF was sending arms back when he would go to Europe and that they told him that he was buying "second-hand tires." He only finally learned that there were guns in the shipments after the final trip to Europe when he saw the word "rifle" written in Dutch on the side of one container. Contrast this version of events with his application for asylum. There, he said that, when his uncle requested that he travel to Europe, "several RUF rebels came to my home in Freetown and 'asked' me to help them buy armaments in Europe." In addition, he justified his involvement by saying "If I did not help, the rebels would kill me because they had disclosed important secret information (such as hide-outs) to me when 'requesting' my help to buy weapons." Sankoh also provided conflicting information regarding the length of his trips to Europe. In his testimony he said that the trips lasted a week to a week-and-a-half; in his application he said that each trip lasted two to six weeks.

These inconsistencies go to the "heart of [his] claim" that he was pressed into service by the RUF and that the group kept him in the dark about the nature of the trips. *Capric*, 355 F.3d at 1090-91. The details surrounding the trips varied, as did his claimed knowledge of their purpose. This variation showed that Sankoh's original claim for asylum evolved in a manner likely to cast him in a better light. And such changes in his story were sufficient to cause the immigration judge to doubt his version of

events. An application for asylum by someone who had reluctantly helped a notorious rebel group run guns is starkly different from one in which a person is conscripted to import various items, which unknowingly included guns. This difference shades Sankoh's claims of past persecution by the RUF as well as his alleged rape and the timing and reasons for departing Sierra Leone. Accordingly, the Board's decision to discount Sankoh's credibility with respect to this story certainly passes muster given the deferential standard of review.

In addition, Sankoh has not shown that the acts of conscription and rape, if true, were motivated by his political opinion. To prove persecution, the alien has to show that the motivation for the persecutory acts was one of the reasons set out in the INA: the alien's "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); *I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). Sankoh has not provided evidence that the motivation behind the RUF's persecutory acts was any of these. He claims that the RUF pressed him into service because he had a passport that would allow for free travel throughout the Europe. There was no evidence, however, that this act of conscription arose because of any of the characteristics identified by the statute or that he was targeted because of his political opinion. *Doe v. Gonzales*, 484 F.3d 445, 447-48 (7th Cir. 2007). We are mindful of the evidentiary challenges facing those seeking asylum. But "the petitioner must produce 'some evidence' that [the persecutory acts were] motivated by a" characteristic listed in the INA. *Li v. Gonzales*, 416 F.3d 681, 685 (7th Cir. 2005). The reason provided by Sankoh here falls well short.

Further, he provided no political or persecutory motive behind his alleged rape. Rape can be an act of persecu-

tion if done "on account of [the alien's] race, religion, nationality, membership in a particular social group, or political opinion." *Nakibuka v. Gonzales*, 421 F.3d 473, 477 (7th Cir. 2005). But Sankoh provides no motivation for the rape whatsoever. We have required some showing of political opposition before we infer persecution on that basis. *See Tapiero de Orejuela v. Gonzales*, 423 F.3d 666, 673 (7th Cir. 2005); *Li*, 416 F.3d at 685. He claims that he expressed antipathy towards the RUF at some point, but never provided any evidence that his political opinion motivated the alleged assault. He states simply that he was raped and that he was conscripted, without showing that either were motivated by his political opinion. As a result, Sankoh has not provided any credible evidence that he was persecuted as defined by the INA.

To avoid this result, Sankoh claims that he was persecuted for his imputed, as opposed to professed, political opinion. When his cooperation ceased after his eighth trip to Europe, he claims, the RUF decided to abuse him and ultimately kill him. This decision, in turn, resulted from a fear that Sankoh would reveal secrets about the movement that he had learned during his forced cooperation. To succeed on a claim that one suffered persecution due to an imputed political opinion, an applicant needs to show both "that [his] persecutors attributed a political opinion to" him and that "this attributed opinion was the motive for the persecution." *Mema v. Gonzales*, 474 F.3d 412, 417 (7th Cir. 2007). Here, Sankoh has not shown a basis for imputing a political opinion to him. An imputed political opinion is necessarily referential; the persecutors suspected the applicant had certain political views because of the applicant's relationship with some-

one who did. *See id.* (collecting cases). Sankoh has not explained the RUF's purported basis for imputing a political opinion to him that he did not outwardly hold. Even taking his claim at face value, the suspicion that Sankoh would betray the RUF's secrets does not indicate that the group imputed a view to Sankoh because of his family or social group. A person can betray secrets for any reason—whether due to opposing political views or simple resentment. In other words, there is simply a failure of proof to Sankoh's claim. Accordingly, we cannot conclude that the Board erred in its conclusions regarding past persecution.

### 2. Well-Founded Fear of Future Persecution

The Board also found that Sankoh had failed to provide sufficient evidence of his well-founded fear of future persecution should be return to Sierra Leone. If an alien cannot establish past persecution, he can still gain asylum based on a "well-founded fear of future persecution." 8 U.S.C. § 1101(a)(42)(A). To prove this fear, Sankoh must show "with credible and specific evidence" that he will face persecution if he returns. *Tapiero de Orejuela*, 423 F.3d at 671-72. The Board held that he had not established this fear. We cannot hold otherwise unless "no reasonable fact-finder could fail to find the requisite fear of persecution." *Elias-Zacarias*, 502 U.S. at 484.

The Board adopted the immigration judge's findings that Sankoh did not have a well-founded fear of persecution should be return to Sierra Leone. Sankoh claimed that he faces persecution by the government in Sierra Leone for his involvement with the RUF and he faces reprisal from the RUF because he fled. We cannot conclude that the

immigration judge and the Board erred in concluding that Sankoh has no well-founded fear of persecution. The immigration judge looked to the 2004 country report to conclude that there was no evidence that the government was persecuting those affiliated with the RUF. The most recent country report says much the same. Bureau of Democracy, Human Rights and Labor, U.S. Dept. of State, *Sierra Leone: Country Report on Human Rights Practice 2007* (Mar. 11, 2008), available at http://www.state.gov/g/drl/rls/hrrpt/2007/100503.htm. Although there are accounts of prosecutions of former RUF members, the country has largely stabilized. As the Eighth Circuit recognized, "there is no evidence the government is retaliating against those who were forcibly conscripted by the rebels." *Jalloh v. Gonzales*, 418 F.3d 920, 923 (8th Cir. 2005). So even if Sankoh is seen as being affiliated with the RUF, there is no evidence that he would be wrongfully singled out by the government. And those prosecutions against RUF members that do occur are before tribunals that provide adequate process. In short, Sankoh has mustered insufficient proof to show that he can objectively fear persecution from the government if he returns.

He also claims that the RUF will exact revenge against him if he returns. But the basis for this alleged future persecution is the fact that he left the RUF for greener pastures abroad. Mistreatment based on an unwillingness to involve oneself with a political group—assuming the RUF meets this definition—does not alone show persecution. *Tapiero de Orejuela*, 423 F.3d at 674. Aside from the immigration judge's unrebutted observation that the RUF is largely finished as a fighting force, if the RUF were to seek revenge for Sankoh's departure, this would

not be "on account of" any factor set out in the INA. Sankoh bore the burden of showing a well-founded fear of future persecution, and he has done little to challenge the Board's conclusion that he would not be persecuted upon his return.

The only evidence Sankoh presents that could potentially conflict with the State Department report are the two letters sent to him from a friend and his family's lawyer. The first, from a friend named Alpha and dated February 25, 1999, describes the RUF's efforts to find Sankoh and its accusations that he was "disloyal" to Foday Sankoh. The second, from a family lawyer and dated March 23, 2001, describes the government's efforts to find Sankoh and accusations that he was an RUF sympathizer. Sankoh claims that the immigration judge improperly credited the country report without explaining why these letters fail to persuade. Taken at face value, he claims, they show a basis for fearing future persecution. We do not agree. The events described in these letters occurred well before Sankoh's present proceeding before the immigration court. The relevant inquiry there was what treatment Sankoh could expect should he return to Sierra Leone. Letters from 1999 and 2001 do little to challenge the conclusions stated in the later country reports regarding country conditions. In other words, even assuming that it was unsafe for him to return to Sierra Leone at the time the letters were written, he has offered no proof that the claims therein continue to hold today. Accordingly, we do not disturb the Board's conclusion denying asylum here on appeal. Because Sankoh's other claims rely on the same evidence, the failure of proof for his asylum claim dooms his others as well.

### III.  Conclusion

For the foregoing reasons, we deny Sankoh's petition for review.